David Harvey BREWSTER, Appellant,

v.

Donald E. BORDENKIRCHER, Warden,
West Virginia Penitentiary, Appellee.

No. 83–6465.

United States Court of Appeals,
Fourth Circuit.

Argued April 5, 1984.

Decided Oct. 5, 1984.

James A. McLaughlin, Charleston, W.Va., for appellant.

John Ernest Shank, Asst. Atty. Gen., Charleston, W.Va. (Chauncey H. Browning, Atty. Gen., Charleston, W.Va., on brief), for appellee.

Before WIDENER, PHILLIPS, and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

In June 1975 the State of West Virginia secured the conviction of David Harvey Brewster for armed robbery of a supermarket. The evidence to support the conviction was easily sufficient. Brewster, however, has now sought a writ of *habeas corpus* because of an alleged invasion of his constitutional rights. Specifically, his allegations, unsuccessful in the district court, were that his enforced appearance before the jury wearing manacles denied him his right to a fair trial under the due process clause of the fourteenth amendment.

Brewster was brought to trial in handcuffs and, over objections by his counsel, he was compelled to wear them throughout the proceeding. The West Virginia judge who presided at the trial made no findings as to the necessity for the manacling that took place. However, on direct appeal to the West Virginia Supreme Court of Appeals, Brewster's allegation of error in that respect led to remand for a determination

as to whether there had been an abuse of discretion in permitting the shackling, *i.e.,* whether there was a "manifest necessity" for employing the procedure. *State v. Brewster,* 261 S.E.2d 77 (W.Va.1979). The West Virginia court recognized that "[s]everal courts have suggested that the question of whether a defendant should undergo trial in physical restraints should be settled at a pretrial hearing where an appropriate record can be made." *Id.* at 81. The hearing on remand was held before Judge Alfred Ferguson in the Circuit Court of Cabell County on September 19, 1980, more than five years after Brewster had been convicted. Judge Robert C. Conaty, who had presided at the trial, had died in that five-year interval.

Judge Ferguson found that Judge Conaty was aware that the prosecution viewed Brewster as someone with the reputation of being an "escape artist." Judge Conaty, it was determined, had discussed alternatives to shackling before the trial began, but since he was in favor of the "open courtroom policy," he decided that merely locking the courtroom was not a viable security measure.[1]

The facts developed before Judge Ferguson that buttressed the "escape artist" designation were essentially as follows:

1) Brewster had, in May 1975, shortly before his trial, escaped from the Cabell County Jail,

2) Brewster made at least two escape attempts, one just prior to trial,

3) Jail officials received five or six telephone calls in which assertions were made that he would attempt to escape again,

4) Brewster had previously been convicted of robbery, and assertions were made that, if given a chance, he would probably escape, and

5) Because there were four to six exits from the courtroom, the two sheriffs on duty at the time of the trial were insufficient to protect against escape.[2]

Judge Ferguson, on the basis of his own conjectural reconstruction of what Judge Conaty would have taken into consideration had he made findings to justify the shackling of the defendant, concluded that the handcuffs were justified by a "manifest necessity." He stated that he reached his decision by determining "the state of mind of the presiding judge ... prior to and on the day of the trial." Judge Ferguson's ruling justifying shackling and concluding that the constitutional rights of Brewster were not infringed was not disturbed by the West Virginia appellate court.

Despite Judge Ferguson's valiant efforts to determine and explain the factors that presumably motivated Judge Conaty in permitting the shackling, there is room for doubt on the subject.[3] For example, Judge Conaty was quoted as saying before trial, "I don't give a damn if you put him in leg irons." In any event, as the law has developed, the question is not what Judge Conaty might have done, but what, in fact, he did do. We need not explore the difficult question whether an adequate explanation might be supplied *nunc pro tunc* by having a trial judge testify as to what he would have found had he set forth grounds for shackling a defendant. In the instant case, Judge Conaty regrettably died without having done anything to establish what he would have found had he set forth his reasons.

The constitutionality of the procedure followed here is to be analyzed in terms of

---

1. William Rogers, Director of Cabell County Pretrial Release and Diversion at the time of Brewster's trial, testified before Judge Ferguson that he and Judge Conaty had "discussed the availability of a lot of men to be brought over to keep Mr. Brewster, other types of security like the locking of the area. The Judge believed in the open courtroom policy. He was not going to lock his courtroom up. He believed in public trials."

2. By contrast, Judge Ferguson also heard testimony that Brewster did not threaten jail personnel or occasion any disturbance throughout the trial.

3. Judge Ferguson frankly acknowledged, "It's hard to read into the mind what he was thinking."

the due process provisions of the fourteenth amendment applicable to the states. The analysis is not in any significant respect different from that used to determine the constitutionality of similar procedures under the due process clause of the fifth amendment governing federal behavior. *Cf. Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976) (in the context of equal protection, the Court notes that the "analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment").[4]

Clearly, the less stringent due process requirements of the past have been modified by more recent developments in the law. On September 15, 1970, nearly five years prior to Brewster's trial, this court handed down its decision in *United States v. Samuel*, 431 F.2d 610 (4th Cir.1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971). The court, faced with circumstances quite like those presented in Brewster's case, articulated the proper procedure to be followed when determining the propriety of shackling.

The defendant in *Samuel* was also shackled in the presence of the jury, and the federal district trial judge denied a motion that the handcuffs be removed when the defendant was about to testify. The judge indicated that he would allow the United States Marshal, as the person responsible for security, to decide whether shackling was proper. He referred to suspicions that "certain people" (ostensibly the two defendants) were proposing to point out, and perhaps even to harm, certain witnesses, and expressed his determination to frustrate conduct of that kind. The district judge, however, did not undertake to state for the record, and out of the presence of the jury, the reasons why the unusual, plainly visible security measure of shackling was to be employed. Nor did it appear that he provided counsel an opportunity to comment or to persuade him that

the shackling measures were unnecessary. Thus, there is a strong resemblance between Judge Conaty's largely silent decisionmaking process and that employed by Judge Lewis in *Samuel.*

In *Samuel,* the law was explicated by Judge Winter, now our Chief Judge, in a manner which bears repeating, for it is pertinent and hardly susceptible of improvement:

> Basic to American jurisprudence is the principle that an accused, despite his previous record or the nature of the pending charges, is presumed innocent until his guilt is established beyond a reasonable doubt by competent evidence. It follows that he is also entitled to the indicia of innocence. In the presence of the jury, he is ordinarily entitled to be relieved of handcuffs, or other unusual restraints, so as not to mark him as an obviously bad man or to suggest that the fact of his guilt is a foregone conclusion.

> However, the right to the indicia of innocence is a relative one. The judge presiding at the trial, the jurors, courtroom personnel and spectators are entitled to security in the performance of their functions or in observing the trial. The members of the public out of the courtroom are entitled to security in the pursuit of their daily activities. The public also has an interest in the expeditious trial of persons accused of crime, and an interest in preventing the guilty from being at large and committing other offenses. Thus, in appropriate circumstances, the accused's right to the indicia of innocence before the jury must bow to the competing rights of participants in the courtroom and society at large. *Cf. Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

> The cases traditionally state that accommodation between these conflicting interests lies within the discretion of the

**4.** *See also Bute v. Illinois*, 333 U.S. 640, 659–60, 68 S.Ct. 763, 773, 92 L.Ed. 986 (1948) (even though the Court ultimately concludes that a state practice in conflict with federal practice did not violate due process requirements of the fourteenth amendment, it notes that federal court practice "contributes something toward establishing a general standard of due process currently and properly applicable to the states under the Fourteenth Amendment").

district judge. It is he who is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the prevention of other crimes. *E.g., Gregory v. United States,* 365 F.2d 203 (8 Cir.1966); *Guffey v. United States,* 310 F.2d 753 (10 Cir. 1962). As a discretionary matter, the district judge's decision with regard to measure for security is subject to limited review to determine if it was abused. We stress that the discretion is that of the district judge. He may not, as is suggested at one part in the record before us, delegate that discretion to the Marshal. Of course, he should consult with the Marshal when other than ordinary security such as the general presence of guards in the courtroom is contemplated, and he may rely heavily on the Marshal's advice as to what may be required since it is the Marshal who has the experience in the keeping of prisoners and who must provide the guards and bear the major responsibility if untoward incidents occur.

Unless the district judge's discretion is to be absolute and beyond review, the reasons for its exercise so as to require special security measures, must be disclosed in order that a reviewing court may determine if there was an abuse of discretion. *Cf. United States v. Broyles,* 423 F.2d 1299 (4 Cir.1970). Whenever unusual visible security measures in jury cases are to be employed, we will require the district judge to state for the record, out of the presence of the jury, the reasons therefor and give counsel an opportunity to comment thereon, as well as to persuade him that such measures are unnecessary. In that manner we will be enabled readily to determine if there has been an abuse of discretion. We will not require the formal taking of evidence on the subject in the usual case, but a district judge may conclude to take evidence

and making findings if the factual need for extraordinary security is controverted. This requirement will apply to all criminal jury cases, the trial of which begin after the date of the filing of this opinion.

*Samuel,* 431 F.2d at 614–15.

Chief Judge Winter accordingly prescribed a rule directly applicable to the federal district courts within the Fourth Circuit. Although the opinion in *Samuel* does not make it explicit that the procedural requirement was dictated by the due process clause of the fifth amendment, such is the logical conclusion, given the analytical focus upon a defendant's entitlement to the indicia of innocence until he is proven guilty. Moreover, it was noted in *Samuel* that the use of unusual restraints "is bound to have some prejudicial effect and can be justified only upon a showing of its necessity." *Id.* at 615–16.

■ Judge Winter was also careful to make clear that the requirement for the statement of reasons made prior to trial by the district judge "will apply to *all* criminal jury cases." (Emphasis supplied). More than a mere exercise of supervisory power,[5] the rule adopted in *Samuel* is expressly designed to preclude prejudicial effect and has its genesis in constitutional fairness itself. As such, the same rule against shackling applies to the states under the fourteenth amendment. *See Cupp v. Naughten,* 414 U.S. 141, 145–46, 94 S.Ct. 396, 399–400, 38 L.Ed.2d 368 (1973) (before a federal court may overturn a state conviction on the basis of a defective jury instruction, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment").

Faced with the realization that the decision in *Samuel* would probably compel substantial alteration of the manner of pro-

---

**5.** *See generally United States v. Hastings,* 461 U.S. 499, 505–07, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96 (1983) (Court's analysis acknowl-

edges the preeminence of the harmless error rule above the mere exercise of supervisory power by a United States Court of Appeals).

ceeding that had theretofore obtained, Judge Winter added, "Since the rule we establish is prospective only," the district judge would be required "to supplement the record with a succinct statement of all the reasons and facts and matters from which he concluded to require defendant to be tried before a jury while wearing handcuffs." *Samuel,* 431 F.2d at 616. As noted above, whether in subsequent cases, by retroactively performing the fact-finding and reasoning that should have occurred prior to trial, a district judge would be permitted to correct his or her failure to follow the dictates of *Samuel* is not clear. In any event, we have no occasion to consider that question, inasmuch as Judge Conaty's regrettable death makes it impossible to employ such a technique.[6]

■ Consequently, the trial judge's failure to make any statement complying with the rule would establish that a constitutional violation has taken place. *See Billups v. Garrison,* 718 F.2d 665, 669 (4th Cir.1983) (because the trial judge "carefully weighed all relevant factors" and made explicit findings "base[d] ... on the information available to him at the time of trial" as to the need to shackle, the Court of Appeals is "unable to say that the trial judge committed *constitutional error* in finding it necessary to restrain [the defendant] during his trial") (emphasis added). Due process was denied when the trial court failed to afford Brewster a proper determination of the need to shackle as of the day he was tried. His right to that determination cannot be vindicated at this point by permitting another judge to perform an after-the-fact second-guessing of matters as they appeared before Judge Conaty at the critical time of trial.

In Judge Winter's words, Brewster stood revealed, as a consequence of his handcuffing, "as an obviously bad man;" the circumstances suggested "that the fact of his guilt [was] a foregone conclusion." *Id.* at

614–15. *See also Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976) (recognizing that a defendant being tried while wearing prison garb created a "continuing influence" that could well "affect a juror's judgment" by allowing "impermissible factors [to come] into play"); *and Taylor v. Kentucky,* 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468 (1978) (Court emphasized that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of ... other circumstances not adduced as proof at trial"). The Supreme Court has likewise recognized that "no person should be tried while shackled and gagged except as a last resort," because of the distinct possibility of "a significant effect on the jury's feelings about the defendant." *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). Far from treating the decision to shackle as a "last resort," the trial judge made the decision on the basis of a record that is flawed by a constitutionally intolerable silence on the issue of the need to restrain Brewster during trial.

■ The State of West Virginia has contended that, given the non-compliance with *Samuel* and the impossibility of determining exactly what did, in fact, motivate Judge Conaty, even if error of a constitutional dimension took place, the error was nevertheless harmless beyond a reasonable doubt. The State thus seeks to rely on *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), in which the Supreme Court acknowledged that "not all trial errors which violate the Constitution automatically call for reversal." The contention is hard to sustain in light of Chief Judge Winter's observation that "any unusual restraint ... is bound to have some prejudicial effect ...." *Samuel,* 431 F.2d at 615. Only an error that

---

6. We note, however, that in *United States v. Thompson,* 432 F.2d 997, 998 (4th Cir.1970) (per curiam), *cert. denied,* 401 U.S. 944, 91 S.Ct. 955, 28 L.Ed.2d 226 (1971), the court stated that it was reiterating "what [it] said in *Samuel,* in the

future the district judge should examine the need for handcuffs and state his reasons for requiring them at the time of trial in the absence of the jury."

918

does not prejudice can be deemed harmless. In short, it is impossible for us to cast aside as "harmless" a constitutional error that led to an increased likelihood of the jury's finding of guilt even before any of the testimony, let alone all of it, had been heard. In the system of American jurisprudence, the presumption of innocence attaches even when the defendant appears, with a high degree of probability, to be guilty. He still is entitled to be tried before an unbiased jury. We do not, in the style of the Red Queen, dispense with trial in "evident" cases, which would be the essential effect of what West Virginia asks us to do when it argues "harmless error."

Had Judge Conaty done what *Samuel* demands, the result might well be different.[7] He did not, however, and a writ of *habeas corpus* should issue, first allowing the State reasonable time in which to bring Brewster again to trial.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

**7.** In marked contrast to the course of events when Brewster was tried were the developments in *Billups, supra,* 718 F.2d 665 (4th Cir.1983). The Court in that case, it is true, refused *habeas corpus* relief to a state court defendant compelled to wear leg irons during his trial. However, it emphasized that the reasons behind the trial judge's imposition of unusual security measures had to have been disclosed and counsel had to have been afforded the opportunity to argue that such measures were unnecessary. The articulation of reasons, made by the state court trial judge before ordering the defendant restrained, was as follows:

(1) the defendant was charged with armed robbery and assault with intent to kill, inflicting serious injury; (2) defendant had other serious charges, including another charge of armed robbery, pending against him and had the previous week received a sentence of not less than forty nor more than fifty years on a different charge; (3) there was an outstanding warrant for escape against the defendant issued by the State of Maryland; and (4) because many of the sheriff's employees were involved in a special venire which had been summoned ... there was only one deputy sheriff to serve as bailiff and security officer for the court.

*Id.* at 666.

In *Billups* there was scrupulous compliance with the mandate of *Samuel,* and the leg irons

In my view the majority in this habeas corpus appeal has elevated a Fourth Circuit rule of procedure into a rule of constitutional significance, and then found a noncompliance with the new-found rule.

In so doing, the majority, I think, has fallen into error, not the least parts of which are that it relied upon the death of the state trial judge as a reason to nullify the West Virginia procedure; it did not follow, and indeed made no mention of, 28 U.S.C. § 2254(d) which requires a presumption by us that the findings of the West Virginia courts were correct; and in elevating our rule of procedure to constitutional significance, as had to be done to arrive at its conclusion of reversal, it did not take account of procedural precedent from the numerous courts considering the matter, including the Supreme Court of the United States.

While the setting of the case by the majority is not inaccurate, neither is it complete enough, I think. There is nothing new or startling about the rule that a prisoner should not be manacled in court.

were evidently less prominently visible than Samuel's or Brewster's handcuffs: the leg irons were seen at most once, with steps taken to ensure that during trial the jurors would not see Billups in shackles. Moreover, a cautionary instruction was given to the effect that Billups' appearing in leg irons should in no way prejudice the jury.

Nevertheless, *Billups* provoked a strong dissent from Judge Ervin, who pointed out that arrangements could and should have been made to reinforce security in the courtroom rather than to have allowed the defendant to be marked as an obviously bad man whose guilt was suggested to be a foregone conclusion. In Judge Ervin's estimation, there were available alternatives for enhancing courtroom security, which made it inappropriate to describe the shackling in Billup's case a "last resort," the criterion imposed by *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970).

Judge Ervin's dissent suggests that *Billups* may stand very close to, if not right on the dividing line between proper and improper activity of a trial judge. We are not, therefore, at liberty to take the large step beyond *Billups* which would be necessary were we to deny a grant of the writ.

West Virginia applied that common law rule at least as long ago as 1898 in *State v. Allen,* 45 W.Va. 65, 30 S.E. 209 (1898). Neither is the suggestion that unnecessary restraint may be unconstitutional, as Professor Beale points out in § 58 of his *Treatise on Criminal Pleading and Practice* (1899). So the rule has been settled for years. In West Virginia the rule is that of the common law. *State v. Brewster,* 261 S.E.2d 77 at 82 (W.Va.1979). In West Virginia, until the *Brewster* case, the rule had been that if the record was silent the appellate court would presume that the trial court exercised a sound and reasonable discretion in not causing shackles to be removed. *Brewster* at p. 81. And in that case the West Virginia court adhered to its common law rule forbidding the in-court shackling of prisoners absent manifest necessity, but changed the rule with respect to a silent record so that it is now "... error to try a defendant in physical restraints over his objection without having developed an appropriate record to justify their use." *Brewster* at p. 82. This right cannot be defeated on the basis that the defendant failed to invoke a pre-trial hearing on the issue. *Brewster,* p. 82, n. 5. The same rule was expressed in this circuit in *United States v. Samuel,* 431 F.2d 610 (4th Cir.1970): "... the reasons ... must be disclosed in order that a reviewing court may determine if there was an abuse of discretion.... We will require the district judge to state for the record out of the presence of the jury the reasons therefor and give counsel an opportunity to comment thereon...." Thus, the West Virginia rule and the Fourth Circuit rule are so nearly identical as to make any distinction meaningless. In *Samuel* we applied our rule prospectively, p. 615, and did not decide the case but directed the district judge "... to supplement the record with a succinct statement of all the reasons and facts and matters from which he concluded to require defendant to be tried before a jury while wearing handcuffs." p. 616. Following the supplement of the record by the district judge, we affirmed the conviction. 433 F.2d 633 (4th Cir.1970). The West Vir-

ginia court went further than did we in *Samuel.* It remanded and required the trial court to "... hold an evidentiary hearing to determine if there were sufficient facts to warrant trying the defendant in handcuffs." 261 S.E.2d at 83. Following that hearing, if the trial court found the defendant should have been so tried, his conviction was ordered to be reentered. If not, the trial court was directed to grant a new trial. 261 S.E.2d at 83. And, remarkably enough, the West Virginia court, in choosing its remedy, relied in terms and specifically on *Samuel,* 261 S.E.2d at 83, the very case upon which the majority principally bases its nullification of the West Virginia procedure. I will confess that it is beyond me why a state court which not only does as we do, but also says as we say, should have its action nullified for its emulation of our example.

Not the least of the error committed by the majority is its reliance upon the death of the trial judge as a reason to nullify the West Virginia procedure adopted by that court in *Brewster.* In terms, the majority refuses to consider whether a West Virginia trial judge should be permitted to supplement the state record as a federal trial judge was permitted to supplement a federal record in *Samuel.* The majority is quite clear on that point: "In any event, we have no occasion to consider that question, inasmuch as Judge Conaty's regrettable death makes it impossible to employ such a technique."

We thus refuse to ascertain Judge Conaty's state of mind because he is dead. Yet, state of mind is daily ascertained by all the courts of the United States, state and federal, in civil cases ranging from fraud to the delivery of a deed, and in criminal cases from murder down to a warrant for a $5 bad check. And if an action for fraud, for example, may be defeated by the death of the man committing the fraud, that is a new proposition to me. The statement of Lord Justice Bowen in *Edgington v. Fitzmaurice,* 29 L.R., Ch.Div. 459, 483 (1884), that "[t]he state of a man's mind is as much a fact as the state of his digestion"

has not been improved upon to my knowledge. No reason exists to fault West Virginia's application of that principle in this case.

Had the case been tried in a federal court and the trial judge died after the verdict, as here, then his duties on remand could have been performed by "any other judge" regularly sitting in or assigned to the court. That is explicit under FRCrP 25(b) which has been literally construed. E.g. *Connelly v. United States*, 249 F.2d 576 (8th Cir. 1957).

Remand for further findings by a trial court in criminal cases (without necessarily ordering a new trial or reversal) is universally recognized. E.g. *United States v. Kolod*, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968) (remand to consider questions regarding improperly obtained wiretap evidence); *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980), cert. den. 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982) (remand to determine if documents contained Jencks Act material); *United States v. Stoddart*, 574 F.2d 1050 (10th Cir.1978) (remand for further inquiry on speedy trial claim). That same rule applies in habeas corpus proceedings. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

Thus, I suggest that I have demonstrated that in remanding the case for further fact finding, albeit with a different judge, West Virginia has done no more than that which is explicitly authorized by the federal rules of criminal procedure and the decisions of the United States Supreme Court as well as this circuit. In this respect, I especially note that the decisions I have cited illustrate that it is an appropriate procedure to remand in a criminal case without necessarily ordering a new trial or reversal, although the question to be inquired into may be a constitutional question. As with our nullification of the state proceeding requiring remand, I am at a loss to understand why the actions of the West Virginia court should be held to be invalid as violations of the federal constitution when the federal courts take the same

actions daily pursuant to their rules and decisions.

By its elevation of the West Virginia procedure to constitutional magnitude, the majority completely overlooks the merits of the claim. The claim of the prisoner is that his constitutional rights were violated because he was manacled during the trial. His rights were not violated because the trial judge failed to insert into the record out of the presence of the jury why the prisoner was manacled. Indeed, the effect on the prisoner is the same whether or not the judge properly made up the record. The jury saw him in handcuffs, and he, of course, is indifferent as to the reason for the handcuffs, for the prejudicial effect on him is the same whatever the record may reveal to be the reason for them. So the inquiry ought to be whether or not the prisoner's rights were violated by his being handcuffed, not whether the trial judge violated a Fourth Circuit procedural rule now elevated to constitutional magnitude.

28 U.S.C. § 2254(d) provides that in any habeas corpus proceeding in a federal court where the prisoner is in custody pursuant to the judgment of a state court "... a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ..., evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct...." unless certain conditions exist, none of which are seriously claimed to be applicable here.

On remand, the state judge conducted an evidentiary hearing. He was ever so careful and placed the burden of proof on the State. He found that on the day of the trial the by then deceased trial judge knew or had been advised or had good reason to believe that Brewster was charged with robbery with the use of a pistol, and also with felonious assault in that he shot the robbery victim. Brewster also had pending at the time of the trial a charge against him for escape from the Cabell County jail (the court was sitting in Cabell County), and three other armed robbery charges. Brewster had previously been convicted of

unarmed robbery in Wayne County, West Virginia, and of armed robbery in the State of Arizona. The Arizona robbery apparently occurred during the period he was at liberty following his escape from the West Virginia state penitentiary. Brewster's character and reputation were poor, and he enjoyed the reputation of being an escape artist. Brewster had escaped from the Cabell County jail only a few months prior to his trial, and had unsuccessfully attempted to escape from the state penitentiary in 1971, prior to his successful attempt in 1972. Brewster also escaped from the penitentiary twice in 1974. The trial court knew that the jailer had received five or six telephone calls stating that Brewster was planning an escape, and several individuals had been to the jailer telling of a proposed escape. The state judge hearing the evidence on remand found that merely using an additional guard for security would not have prevented the defendant from attempting an escape by way of threatening physical harm such as by taking a hostage, this because of the serious nature of the present charge, the defendant's history of violence during confinements, and history of escapes. The trial court on remand was of opinion that a manifest necessity existed which required the use of physical restraints. The trial court, following the hearing, filed its written opinion and reentered Brewster's conviction rather than ordering a new trial. Serious exception is not taken to any of the findings of fact of the state court, which in all events are presumed to be correct under § 2254(d), and no evidence sufficient to refute them is in the record. Certainly the facts of this case are far more aggravated than those in *Samuel* considered after the trial judge supplemented the record. In *Samuel* it will be remembered we affirmed the conviction. 433 F.2d 633 (4th Cir.1970).

Finally, I should say that the action of the majority in reversing this case seems to me to be a reaching out to establish a constitutional norm where none existed before, and then finding the new norm violated. I am of opinion that procedurally and substantively the decision of the majority is not in accord with established precedent.