Alexander STEWART,
Petitioner–Appellant,

v.

Robert CORBIN, et al.,
Respondents–Appellees.

No. 86–2920.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 16, 1987.

Decided June 16, 1988.

Craig A. Morgan, Phoenix, Ariz., for petitioner-appellant.

Joseph T. Maziarz, Diane M. Ramsey, Asst. Attys. Gen., Phoenix, Ariz., for respondents-appellees.

Before CANBY and BOOCHEVER, Circuit Judges, and IDEMAN,* District Judge.

IDEMAN, District Judge:

## I. INTRODUCTION

This is an appeal from a judgment of the United States District Court for the District of Arizona denying appellant's petition for a writ of habeas corpus. The writ was sought on the grounds that the shackling and gagging of appellant during his jury trial for armed robbery in state court violated his right to due process of law as guaranteed by the United States Constitution.

We hold that under the circumstances presented in this case, appellant's federally guaranteed constitutional rights were not violated. Furthermore, we hold that certain other claims of appellant do not present federal questions or were not presented to the district court and thus were not preserved for review by this court.

AFFIRMED.

* Honorable James M. Ideman, United States District Judge, Central District of California, sitting by designation.

## II. THE ROBBERY

### A. *Prosecution's Rendition*

The jury heard the following evidence regarding the robbery: On July 18, 1980, Steven Levine was working as a night auditor at the Howard Johnson's Motor Lodge in Tempe, Arizona. Mr. Levine called the police when he noticed a suspicious car in the parking lot at approximately 3:00 a.m. Shortly thereafter, two males walked in. One of the two males, who was subsequently identified by Mr. Levine as appellant, was described by Levine as a black male, approximately five-seven or eight, wearing a dark shirt and army fatigue pants. They initially pretended to want a room. One of them, later positively identified by Levine as appellant, pulled out a gun and forced him to lie on the floor. The two men tied Levine's legs and struck him on the back of his head. They then emptied the cash register and the safety deposit box, taking approximately $130.00 in cash. The two men subsequently fled out the back way when the police arrived.

Following a radio broadcast, the suspect car was spotted pulling into a parking lot. Two men ran from the car. A police helicopter later spotted appellant hiding nearby. Appellant was wearing a black tank top and army fatigue pants when he was arrested. He was carrying a loaded gun, and had $139.00 in his pocket. A search of the suspect vehicle revealed eight different motel room keys, a loaded shotgun, and appellant's fingerprints on an interior window.

### B. *Defendant's Rendition*

Appellant took the stand on his own behalf and testified on direct examination that he was a passenger in the car and did not participate in, nor know about, the robbery. However, he refused to submit to cross-examination by the prosecution. The trial court eventually struck appellant's direct examination and admonished the jury to disregard it. There was no other evi-

dence for the defense. Thus there was no defense evidence for the jury to consider. Therefore, the state of the record as to the evidence before the jury is that the prosecution's evidence was uncontroverted.

## III. THE PRETRIAL SHACKLING HEARING

The prosecution made a pretrial motion that appellant be shackled during the trial. The trial court held a hearing on that motion that extended over several days, which included the testimony of numerous witnesses. This court has conducted an independent examination of the record of that hearing, a transcript of which is before us as an exhibit. In addition to the facts alluded to in counsels' briefs we have noted a number of other facts disclosed at that hearing, tending to show that appellant was a violent, disruptive, dangerous and contumacious individual who was a very high escape risk and who also presented a distinct risk of physical assault to courtroom personnel.

The hearing revealed the following:

Appellant lied about his identity when arrested, at his preliminary hearing, and at the pretrial hearings.

Appellant falsely told the court that he had no prior convictions. It was proved that, under his true identity, appellant had four prior felony convictions for armed robbery, assault, and escape. In addition, appellant was wanted by the State of New Jersey for yet another escape. The escape that constituted a prior conviction occurred while appellant was being taken under guard to a hospital for treatment. He bolted from the officers' custody and threw himself through a plate glass door. The escape for which appellant was wanted was perpetrated while he was handcuffed and being transported under guard. Obviously, it was successful.

There was testimony that several judges who had presided during various court proceedings in this case had warned appellant that he might be removed from their courtrooms due to his obstreperous conduct, which was described as emotional, overly impulsive, and erratic.

Appellant had threatened one judge, using abusive language.

Appellant fought with Deputy Evans while in the courtroom during an earlier pretrial proceeding and knocked the deputy down.

One of appellant's former defense attorneys, Mr. Warren Levenbaum, testified and admitted that appellant was disruptive. Mr. Levenbaum testified that based upon his observations of appellant in court, he considered appellant to be a violent person. Mr. Levenbaum further testified to the confrontation between appellant and Deputy Evans in court wherein Deputy Evans struggled with appellant in an effort to restrain him. Appellant struck the deputy in the chest, knocking him off balance. They struggled until Deputy Evans finally subdued the appellant and forcibly removed him from the courtroom. Deputy Evans testified at the pretrial hearing that he believed that appellant was attempting to assault him and escape, although the presiding judge did not view the altercation as an escape attempt. Deputy Evans sustained injuries from this struggle with appellant. At the time of this confrontation appellant was wearing handcuffs, which obviously were insufficient to control him.

Appellant also issued verbal threats of physical assault in open court. Following an unfavorable ruling concerning self-representation during a pretrial hearing, appellant told the judge: "... Don't make me get hostile. I don't want to have to start attacking people physically. But I'm telling you, you put me in that position. If you send someone to represent me, he is going to be subjected to an attack."

At one point appellant tore off a part of a court exhibit and took it with him from the courtroom.

An officer from the sheriff's department testified that appellant was considered an escape risk, and extra precautions were taken when transporting him.

An officer testified that in his opinion, a leg brace alone would be insufficient to ensure the security of appellant.

Major Perkins, a deputy with the Maricopa County Sheriff's Department, testified to a struggle he had with appellant while escorting him out of the courtroom.

After hearing several days of testimony on the shackling question, the trial court interrupted the hearing to select a jury. The court stated: "I think we'll just recess and we'll draw the jury at 9:30 on Monday, then we'll recess and do whatever else we have to do on this subject." (The shackling hearing.) The court was not ready to make a decision on shackling appellant since it had not then heard all of the evidence on the question but made an interim order that appellant wear a leg brace under his trouser leg during the jury selection process.

Appellant, who was representing himself at this point, objected to the leg brace on the grounds that it would make him limp and therefore be prejudicial before the jury as the jury might conclude that he was faking a limp to confuse his identification by the witnesses. Appellant claimed that he did not know how to operate the leg brace, but a deputy testified that appellant had been shown how to operate it. Appellant finally agreed to the leg brace but in the presence of the court and the jury panel "collapsed" into his chair, due to his claimed inability to operate the leg brace.

After the jury was selected, the shackling hearing continued. The trial court heard details concerning appellant's recent escape from custody in New Jersey, while he was being transported by two guards with his hands handcuffed behind his back. There was testimony about appellant's disruptive conduct in the local jail, including throwing a food tray at a detention officer and being in an area of the jail that was off-limits to him. A deputy testified that he did not think he could control appellant unless he was in leg irons and handcuffs. The trial court noted that many of appellant's own witnesses supported the allegations regarding appellant's disruptive behavior.

At the conclusion of the hearing, the trial court concluded that appellant should be shackled and handcuffed during the trial, due to the risk of escape. The court ruled: "It's the burden of the Court to make a decision on the basis of some evidence and [appellant] many of your own witnesses confirmed the allegation of the county attorney, so it is going to be my order that you remain shackled and cuffed." At this point appellant changed his mind about the leg brace and offered to wear it in lieu of shackles. However, the trial court adhered to its ruling.

## IV. THE ORDER TO GAG APPELLANT

The prosecutor made a pretrial motion *in limine* to preclude appellant from requesting a lie detector test in the presence of the jury. The prosecutor informed the trial court that during one of appellant's trials in a New Jersey court, appellant had jumped to his feet in the presence of the jury and requested a lie detector test. Appellant was later acquitted by the jury. The prosecutor also requested that the trial court order appellant not to refer to a prior misdemeanor conviction for "joyriding" that the victim, Mr. Levine, had suffered.

The trial court granted the motion *in limine* and ordered appellant not to refer to a lie detector test and not to mention the prior conviction of Mr. Levine. The trial court warned appellant that if he violated the court's order, he would be gagged.

Appellant, who was representing himself at the time, promptly began his opening statement to the jury by telling them that the victim was a convicted car thief. When the trial court warned appellant that his behavior was unacceptable, appellant blurted out twice that he had been denied the opportunity to take a lie detector test. The court reporter's notes described the condition of the courtroom at that time as "total chaos."

We note that the conduct of appellant was evidently intimidating the major witness for the prosecution, Mr. Levine. After the uproar created by appellant's outburst, the judge sent the jury to the jury room. At the request of defense counsel the judge asked the witness, Mr. Levine, who had been in the courtroom, to withdraw. The witness stated: "Your Honor,

I'm afraid of this man." Thereafter the prosecutor told the court: "... Your Honor, the witness was very upset, he has indicated to me several times he is very terrified."

Before ordering appellant gagged, the court offered appellant the option of continuing the trial in a soundproof cell. Appellant refused that option. That offer was repeated later in the trial and appellant refused again, stating that he did not want to be placed where he could not communicate with counsel or the jury. Realizing that this order made it impractical for appellant to continue to represent himself, the trial court appointed counsel to represent him. This attorney, Mr. Coffinger, who had represented appellant at earlier stages in the case, was evidently fully prepared and had been standing by in case appellant's pro per rights were terminated for just the type of misconduct that had occurred.

The gag was removed periodically when the jury was not present so that appellant could confer with his counsel and could address the court. In addition, one of appellant's hands was left unshackled so that he could write notes to his counsel.

The gag was removed so that appellant could testify on his own behalf. Initially, appellant stated that although he wished to testify, he would not answer questions from the prosecutor. The court explained to appellant that if he would not agree to submit to cross-examination he could not testify at all. Appellant then agreed to submit to cross-examination. However, after testifying on direct examination, appellant refused to submit to cross-examination by the prosecutor. In addition, appellant created an outburst, disobeyed the court's order to remain seated, and had to be physically forced into his seat by a deputy.

The trial court struck appellant's direct testimony from the record, and ordered the jury to disregard it.

## V. DECISIONS BY THE VARIOUS COURTS

The jury convicted appellant of armed robbery with use of a firearm. The trial judge sentenced appellant to a term of thirty-five years in prison, to be served consecutively to a term currently due to be served in a New Jersey prison, which was interrupted by his escape.

The Arizona State Court of Appeals subsequently reversed appellant's conviction and ordered a new trial, solely on the grounds that the shackling of appellant was improper. That court found that the shackling was an extreme measure not justified by the circumstances, stating that the trial court failed to consider and adopt less drastic measures. *State v. Stewart*, 139 Ariz. 66, 70, 676 P.2d 1124, 1128 (1983).

The Arizona Supreme Court reinstated appellant's conviction and sentence. That court held that the use of shackles and gag was supported by the record. *State v. Stewart*, 139 Ariz. 50, 54, 676 P.2d 1108, 1112 (1984).

Appellant then filed a petition for a writ of habeas corpus in the United States District Court for the District of Arizona. The petition was dismissed for failure to exhaust state remedies.

After exhausting state remedies, appellant filed a second petition for the writ, which was denied by the district court. Appellant then filed the instant appeal.

## VI. ANALYSIS

This court reviews the factual findings of the United States District Court for the District of Arizona in a 28 U.S.C. Section 2254 action under the "clearly erroneous" standard. Furthermore, this court reviews the legal conclusions of the United States District Court for the District of Arizona *de novo Knaubert v. Goldsmith*, 791 F.2d 722, 729 (9th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 228, 93 L.Ed.2d 155 (1986); *Hayes v. Kincheloe*, 784 F.2d 1434, 1436 (9th Cir.1986), *cert. denied*, — U.S. —, 108 S.Ct. 198, 98 L.Ed.2d 150 (1987).

A. *The United States District Court Did Not Commit Reversible Error in Determining that the Arizona Courts Did Not Deny Appellant His Constitutional Right to a Fair Trial.*

Appellant contends that the Arizona trial court's decision to shackle and gag him

during the trial was a denial of his due process rights. The issue in the present case is not whether in retrospect, the trial court could have handled the matter better, but rather, whether the trial court denied appellant a fair trial under the circumstances. *See Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 1348, 89 L.Ed.2d 525 (1986) (the issue of guards in the courtroom is not how federal guards should appear in court, but whether what the jury saw was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial).

■ The use of shackles and gags are not *per se* unconstitutional. *Illinois v. Allen*, 397 U.S. 337, 343–44, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), *reh'g denied*, 398 U.S. 915, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970). The United States Supreme Court stated:

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.... We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant ...: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.

*Id.* at 343–44, 90 S.Ct. at 1061.

The competing interests surrounding the question of physical restraints were succinctly set forth in *Brewster v. Bordenkircher*, 745 F.2d 913, 915 (4th Cir.1984):

> Basic to American jurisprudence is the principle that an accused, despite his previous record or the nature of the pending charges, is presumed innocent until his guilt is established beyond a reasonable doubt by competent evidence. It follows that he is also entitled to the indicia of

innocence. In the presence of the jury, he is ordinarily entitled to be relieved of handcuffs, or other unusual restraints, so as not to mark him as an obviously bad man or to suggest that the fact of his guilt is a foregone conclusion.

> However, the right to the indicia of innocence is a relative one. The judge presiding at the trial, the jurors, courtroom personnel and spectators are entitled to security in the performance of their functions or in observing the trial. The members of the public out of the courtroom are entitled to security in the pursuit of their daily activities. The public also has an interest in the expeditious trial of persons accused of crime, and an interest in preventing the guilty from being at large and committing other offenses. Thus, in appropriate circumstances, the accused's right to the indicia of innocence before the jury must bow to the competing rights of the participants in the courtroom and society at large.

*Id.* at 915.

It is the defendant, not the state that puts the courts in the dilemma of balancing these equally important considerations. "The contumacious defendant brings his plight upon himself and presents the court with a limited range of alternatives. Obviously, a defendant cannot be allowed to abort a trial and frustrate the process of justice by his own acts." *Estelle v. Williams*, 425 U.S. 501, 505, n. 2, 96 S.Ct. 1691, 1693 n. 2, 48 L.Ed.2d 126 (1976). Therefore, when the balancing process takes place, the focus rightly belongs on appellant's behavior in the trial court.

■ The above-mentioned balancing of competing interests is left to the discretion of the trial court, which is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the prevention of other crimes. *Brewster v. Bordenkircher, supra,* at 916. Moreover, the appellate court is not in as favorable a position as the trial court to determine the effect of the defendant's disruptive conduct on the proceedings. Even though facial

expressions, gestures, and other nonverbal conduct are significant, they cannot be transcribed by the court reporter. Also, the reaction of jurors and witnesses is easily observed by the trial judge but seldom appears in the written record. Therefore, great deference must be given to the decision of the trial court. *United States v. Ives*, 504 F.2d 935, 942 (9th Cir.1974), *vacated on other grounds*, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), *opinion reinstated*, 547 F.2d 1100 (9th Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977).

Although this case involves both shackling and gagging of appellant, the order to do those things came at different times.

■ At the time the court ordered appellant shackled, the court had the following to consider:

Of the appellant's several past felony convictions one conviction was for escape. Appellant was "wanted" for a second escape. Both escapes were from the immediate physical custody of law enforcement officers, one while handcuffed.

He also physically assaulted officers in the courtroom, threatened a judge and an attorney, and tore off and took part of an exhibit. He disobeyed the orders of several judges with respect to his conduct in court.

Officers had testified that appellant could not be controlled by a leg brace alone and that leg irons and handcuffs were required. Many of appellant's own witnesses supported the allegations regarding appellant's disruptive behavior.

We believe that the above facts more than justified the decision of the trial court to shackle appellant.[1] The court was forced to deal with appellant's disruptive behavior, the severity of which cannot fully

be reflected in the written record. After an extensive hearing it was apparent that appellant was an extreme escape risk who habitually displayed erratic and violent behavior. The court acknowledged that it could not control appellant. The record supports the need to restrain appellant in order to prevent him from escaping, and to protect the safety of persons in the courtroom from his violent outbursts.

It was unfortunate that the jury panel first saw appellant without the shackles and later with them. That could indicate to the jury that something had happened between the hearings to require a greater degree of security for his person. In a sense, that perception was correct—what had happened was that the trial court had completed its hearing on the matter and concluded that shackling was necessary. (We note that the jury was already probably aware that appellant was under greater than usual custodial restraint since appellant made a point of "falling" into his chair in front of the jury while wearing his leg brace.)

There is no suggestion, however, that the increase in security was deliberately done to prejudice appellant in the eyes of the jury. It appears that it simply was a matter of the hearing not being concluded at the time the jury venire reported, and the trial judge elected to select the jury at that time rather than have the entire panel report back at a later time. There is an argument that the latter course of action would have been preferable, but the failure to do so does not rise to the level of a deprivation of the fundamental right to a fair trial. In any event, the outrageous conduct of appellant later in the presence of the jury would soon show the jury that which appellant, for reasons of his own,

---

1. The record makes clear that the trial judge did rely on the facts brought out at the shackling hearing when he decided that appellant must be shackled. Later in the proceedings, appellant requested that the jury be instructed that appellant had done nothing in the days between voir dire and the opening of trial to cause the change from leg brace to shackles. The trial court refused the instruction, stating that the defendant was shackled because he refused the leg brace in that interim period, and the judge did not want to deal with similar problems every morning. Appellant contends that the trial judge's remarks show that appellant was shackled merely for the trial judge's convenience. We do not so regard the remark, which must be interpreted in context. It does not limit the judge's earlier ruling, made at the end of the shackling hearing and obviously based on the evidence there presented.

evidently wanted to display: that he was a violent, disruptive and contumacious defendant who obviously required extraordinary safeguards.

■ The order to gag appellant came later. As previously related, the trial court had ordered appellant not to mention two subjects in front of the jury: a request for a lie detector test, and the misdemeanor conviction of the victim. The court explicitly ordered appellant not to refer to a lie detector test, and warned him that if he disobeyed he would be gagged. The court stated:

I am ordering that at no time shall you blurt out that you want a polygraph test because if you had one it would not be admissible, so it is immaterial. I do not plan to tolerate, and I have told you from day one, that Arizona allows the defendant to be gagged, so any misconduct in that line will result in you being gagged.

The prosecutor had informed the court that appellant had used the ploy of asking for a lie detector test in front of a New Jersey jury and appellant had been acquitted. We of course do not know what effect, if any, that statement had on the acquitting jury, but appellant may very well have concluded that this was a promising avenue to explore in future trials. In any event, he promptly disobeyed the court's order and mentioned *both* of the forbidden topics to the jury. Following his refusal to be put in a soundproof room for the remainder of the trial, the gagging order ensued.

After appellant was gagged he obviously could not represent himself. It was then necessary to have the advisory counsel, Mr. Coffinger, step in as counsel of record. The gag was removed periodically to allow appellant to confer with his counsel and to address the court.

The court ordered the gag removed so that the appellant could testify, after appellant promised to answer the questions on cross-examination. However, after appellant testified on direct-examination, he refused to answer any questions on cross-examination, even after being ordered to do so. Thus, appellant once again demon-

strated his flagrant disregard for the court's orders. Furthermore, a deputy had to physically force appellant into his chair due to his outburst. The court then stated:

I want the record to show that the deputy had to physically throw him into his chair, so when you say that the Court could control the [appellant], I don't see how I can. I advised counsel that I would order it stricken from the court record, and that's all I can do, I cannot make him answer.

The gag was then replaced.

It is to be noted that the judge had warned appellant that he would gag appellant if he violated the court's order in this regard. The trial court also had information that the victim in the case was "terrified" of appellant and the court could rationally conclude that appellant's conduct was designed in part to intimidate witnesses and others.

It is clear that appellant was not amenable to the orders of the court, was out of control and that the viability of the trial was in jeopardy. The order to gag appellant was clearly supported by the record.

Were other alternatives open to the trial court? In *Illinois v. Allen,* 397 U.S. 337, 343–44, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), *reh'g denied,* 398 U.S. 915, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970), the Supreme Court states that there are at least three constitutionally permissible ways to deal with disruptive defendants: 1) binding and gagging, 2) citation for contempt, and 3) exclusion from the courtroom.

An attempt to control this appellant by citing him for contempt would obviously have been a useless act and merits no further discussion.

Appellant was offered a soundproof room before he was gagged, but after he had been shackled. He refused this offer twice, stating: "I object to any sound room where the jury is not present, where I cannot communicate with my attorney *or the jury.*" (emphasis added.) This stated desire to "communicate with the jury" after appellant's flagrant misconduct in telling the jury that which the trial court had forbidden him to state in front of the jury makes it quite clear that appellant wanted

to be in the presence of the jury as a matter of his "trial tactics" and would not have been amenable to being excluded from the courtroom from the beginning of the trial.

Moreover, we are of course aware that we are not reviewing here a decision of a United States District Court wherein this Court has certain supervisory powers. We do not exercise supervisory powers over state courts. The only question before this court is whether th ʼ appellant's federally guaranteed right to a fair trial was violated. We conclude that it was not.

The evidence of guilt at trial was overwhelming and uncontradicted. Appellant presented a severe risk of escape and physical assault upon court personnel. He deliberately disobeyed the orders of the court in order to present improper matters to the jury and perhaps to intimidate witnesses and others. The trial court, under all the circumstances, chose a constitutionally permissible course of handling the problem presented by appellant's intentional misconduct. He was dealt with fairly under the circumstances.

B. *Interference With Appellant's Right of Self–Representation Was Necessary and Appellant Was Protected by the Appointment of Counsel.*

■ Appellant contends that the gagging violated his right of self-representation. Since we have already held that the gagging was required, and gagging is a permissible remedy, *Illinois v. Allen,* 397 U.S. 337, 343–44, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970), the interference with self-representation was a necessary one. The appellant was protected by the appointment of counsel.

C. *Appellant's Contentions that the Trial Court Failed to Adequately Instruct the Jury Regarding the Shackles and that the Trial Court Erred in Admitting a Particular Exhibit Do Not Create Constitutional Questions.*

Appellant contends that he was denied his right to a fair trial based on the trial court's failure to timely instruct and ad-

monish the jury from considering the shackles. Furthermore, appellant argues that he was denied a fair trial based upon the trial court's admission of an exhibit, which was allegedly not in compliance with A.R.S. Rules of Criminal Procedure, Rule 15.1(a)(4).

The trial court did include an instruction on shackling along with his other instructions to the jury. Appellant's challenges to the instructions and the evidentiary rulings do not rise to the level of deprivations of constitutional rights remedial under 28 U.S. C. § 2254. *See Gutierrez v. Griggs,* 695 F.2d. 1195, 1197 (9th Cir.1983). Therefore, the above-mentioned arguments are not appropriate issues for review by this Court.

## VII. CONCLUSION

We conclude that appellant was fairly tried and convicted. The matters about which he complains were caused by his deliberate misconduct. He put the trial court in a dilemma, to which there was no perfect solution. The solution of the trial court did not cause appellant to be denied a fair trial under the United States Constitution.

The judgment of the district court denying the writ of habeas corpus is AFFIRMED.