MARK JAMES ROGERS, aka MARK JOSEPH HEYDUK, aka TEEPEE FOX, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 14020

September 3, 1985 705 P.2d 664

[Rehearing denied January 7, 1986]

*Thomas E. Perkins,* State Public Defender, and *J. Thomas Susich,* Special Deputy State Public Defender, Carson City, for Appellant.

*Brian McKay,* Attorney General, Carson City, and *Richard A. Wagner,* District Attorney, Lovelock, for Respondent.

458

## OPINION

*Per Curiam:*

Appellant, Mark James Rogers, was convicted by a jury of murdering three victims, for which he received a sentence of death. Additionally, he was also convicted of attempted murder and grand larceny. On appeal, Rogers raises numerous issues, none of which warrants reversal of the convictions or sentences imposed. We accordingly affirm.

*The Facts*

On December 3, 1980, Frank and Linda Strode returned from a Thanksgiving trip to their home in an isolated part of Pershing County near Majuba Mountain, where they resided with Frank's parents, Emery and Mary Strode, and Frank's sister, Meriam Strode Treadwell. When they entered the parents' trailer, they found the dead bodies of Emery, Mary and Meriam under a blanket in a bedroom. Emery had been shot three times and stabbed twice with a knife which was left in his chest. A pocket watch discovered in Emery's shirt pocket had been struck by one of the bullets; the hour hand of the watch was stopped at one o'clock. Mary had been stabbed in the back and shot in the chest. Meriam, whose wrists were bound with an electric cord, died from a single gunshot wound in her back. Emery and Meriam kept daily diaries. The last entry in both diaries was recorded on the morning of December 2, 1980.

On December 1, 1980, between 4:30 and 5 p.m., Robert Schott gave defendant a ride from Winnemucca to Imlay. As soon as Rogers climbed into Schott's truck, he looked nervously in both the back of the truck and the rear view mirror. Defendant introduced himself as John and claimed that he was a musician going to Reno to look for a job. At one point during the drive, defendant blurted out: "You may not believe it but I am a good American. You may not believe it but I'm on your side. I would fight for my country."

On December 2, 1980, between approximately 12:15 and 12:45 p.m., David Hartshorn, a geologist working at the Majuba Hill Mine, observed Rogers standing alongside a road near Majuba Canyon and offered him a ride. During the ride, Hartshorn gave defendant a can of Seven-Up to drink. Defendant stated that "[s]omebody is shooting rockets . . . and one of these days it will hit my pyramid and blow me up." Rogers alighted at the Strode residence with the Seven-Up can in hand.

Between 12:30 and 2 p.m. that same day, Ray Horn, a mechanic at a nearby mine, was driving on a county road near Majuba Mountain. As he passed a dark metallic blue truck, a slender young man driving the truck shot at Horn several times. Between 3:30 and 4 p.m., Earl L. Smith, a highway maintenance worker, saw Rogers standing on a road between Denio and Winnemucca and provided him a ride because defendant had run out of gasoline. Rogers was later observed traveling at an extremely high rate of speed in a blue truck, which was identified by its license number as the Strodes' truck.

On December 5, 1980, Rogers was refused entry into Canada. In conversing with a Canadian police officer, Rogers indicated that he was the King of North America. On January 4, 1981, defendant was arrested in Florida when he was seen riding on the

bumper of a car, holding on to a luggage rack. After he was arrested, Rogers told police that God knew him and that we were all a part of mother nature. During fingerprinting, defendant refused to speak and wrote on a piece of paper that he belonged to the government. Later at the jail, defendant claimed that he had killed the Strode family in self-defense.

Rogers' fingerprints were lifted from various items in the Strode residence, including a Seven-Up can and a glass jar found in the bedroom under the blanket with the victims' bodies. At trial, the defense presented the testimony of several expert witnesses which indicated defendant was a paranoid schizophrenic at the time of evaluation and that defendant's behavior at the time of the commission of the crimes was consistent with psychotic paranoid delusions, schizophrenia and psychosis and that Rogers could not tell right from wrong or the nature and quality of his acts. One psychologist believed that the defendant, who was trained in acting, was faking his symptoms. After finding the defendant guilty of the crimes charged, the jury imposed the death penalty for the three murder convictions, and prison terms for the attempted murder and grand larceny. Defendant now appeals the judgment of conviction and the imposition of the death penalty.

## *The Guilt Phase*

Defendant contends that the court erred in denying his motion for change of venue because the editor/publisher of a local newspaper, in a conversation with defense counsel, acknowledged her prejudice against defendant. Defendant reasons that if the newspaper is biased, then the community must be biased. Counsel's affidavit in support of the motion to change venue was unsupported by any evidence which might have demonstrated the extent or inflammatory nature of any pretrial publicity, or whether there was any prejudicial effect on the prospective jurors. Under these circumstances, where defendant failed to demonstrate that any pretrial publicity corrupted the trial, the district court did not abuse its discretion in denying defendant's motion for change of venue. NRS 174.455; Kaplan v. State, 96 Nev. 798, 618 P.2d 354 (1980).

Relying on Sollars v. State, 73 Nev. 248, 316 P.2d 917, (1957), Rogers also argues that the district court erred by denying his motion to sequester the jurors. In *Sollars,* we reversed a first degree murder conviction because the trial court permitted separation of the jury where there was a daily barrage of inflammatory headlines in two daily Las Vegas newspapers. We determined that

the court's admonition to the jury not to read the newspapers was insufficient because it could be inferred that the jury was exposed to prejudicial communications merely by glancing at any headline.

It is true that a trial court must exercise care and sensitivity in granting separation over a defendant's objection. We nevertheless conclude that *Sollars* is inapposite to the instant case. The district court's attention was not drawn to any newspapers or other forms of communication to which the jurors may have been exposed to the defendant's prejudice. Moreover, the grounds for defendant's motion were merely that "[n]o doubt there will be a great deal of publicity at the time of the present trial, and it will be most difficult for the twelve selected jurors not to be influenced by the negative feelings present in the community." The jurors were examined on voir dire regarding their exposure to news accounts of the crime. The trial court admonished the jury before each separation and in the final jury instructions that they were not to be influenced by public opinion and that they were to consider only the evidence produced at trial. As this Court stated in Crew v. State, 100 Nev. 38, 675 P.2d 986 (1984), the decision of the trial court "will be overturned only if appellant demonstrates that either the nature of the publicity or the jury's actual exposure to it created a probability of prejudice." Here, there was simply no demonstration that the jurors were exposed to any form of communication that would have adversely impacted their commitments to fairly and impartially weigh the evidence adduced at trial. The trial court did not abuse its discretion in denying sequestration. NRS 175.391.

Defendant insists that the State's failure to preserve the jar with his fingerprint on it that was found under the blanket with the victims' bodies deprived him of due process because an examination of the jar may have led to evidence refuting prosecution testimony. We disagree.

Where a defendant seeks to have his conviction reversed for loss of evidence he must show either bad faith or connivance on the part of the government or prejudice by the loss of the evidence. Wood v. State, 97 Nev. 363, 632 P.2d 339 (1981); Crockett v. State, 95 Nev. 859, 603 P.2d 1078 (1979). This burden requires a showing that it could be "reasonably anticipated that the evidence sought would be exculpatory and material to appellant's defense." Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 108 (1979).

The record does not reveal any bad faith on the part of the State in failing to preserve the evidence. A State investigator testified

that investigators preserved only what they believed were significant samples. Additionally, defendant has failed to carry the burden of showing how he has been prejudiced by the loss of the jar. The print lifted from the jar matched that of defendant. Defense counsel's mere assertion that his examination of the evidence may not have disclosed any of defendant's prints is not sufficient to show prejudice. *Boggs,* 95 Nev. at 913, 604 P.2d at 108 (a hoped for conclusion from examination of the destroyed evidence is not sufficient). Assuming, arguendo, that defendant's print was not on the jar, he has not demonstrated how the jar would have been exculpatory since his fingerprints were lifted from numerous other items found in the Strode residence which were preserved by the State. We therefore conclude that the State's failure to preserve the jar did not deprive Rogers of due process.

We are invited by the defendant to disavow the M'Naughten rule as the test for criminal responsibility and supplant it with the standard devised by the American Law Institute. Defendant's invitation is declined. We have recently rejected such a request and reaffirmed Nevada's use of the M'Naughten test for criminal insanity. Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984); Poole v. State, 97 Nev. 175, 625 P.2d 1163 (1981); Clark v. State, 95 Nev. 24, 588 P.2d 1027 (1979). Defendant also contends that requiring him to bear the burden of proving insanity deprived him of due process because sanity is an element of the charged crime. In *Ybarra,* we also reaffirmed our position that sanity is not an element of the offense which the prosecutor must plead and prove. Insanity is an affirmative defense which the accused, who is presumed sane, must prove by a preponderance of the evidence. *See also* Clark v. State, 95 Nev. 24, 28, 588 P.2d 1027, 1030 (1979); In re Winship, 397 U.S. 358 (1970); Mullaney v. Wilbur, 421 U.S. 684 (1975); Patterson v. New York, 432 U.S. 197, 205-207 (1977).

Defendant next contends that the death penalty violates the Eighth Amendment because it is applied in a discriminatory and infrequent manner in that most persons sentenced to death are indigent and represented by a public defender. We are unaware of any constitutional infirmity attributable to indigency and have observed no basis for concluding that defendants receiving the ultimate sentence in Nevada have been inadequately or apathetically represented by counsel in the office of the public defender. We have recently approved Nevada's death penalty statutes as constitutional in the face of an Eighth Amendment challenge. Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984); Deutscher v.

State, 95 Nev. 669, 601 P.2d 407 (1979); Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979). Defendant also opines that the death penalty violates the Ninth Amendment of the U.S. Constitution and the Nevada Constitution, article 1, section 1, which provide: "All men are by nature free and equal and have certain inalienable rights." Defendant has not cited any authority in support of this argument and we therefore decline to review this contention. Bennett v. Fidelity & Deposit Co., 98 Nev. 449, 652 P.2d 1178 (1982).

Defendant asserts that by refusing to allow defense counsel to ask each juror what his or her individual verdict was in previous jury service the district court unreasonably restricted voir dire. Defendant has not shown that the court's restriction on questioning resulted in the inability of the defense to determine the existence of prejudice on the part of any juror. NRS 175.031; Oliver v. State, 85 Nev. 418, 456 P.2d 431 (1969). The court allowed extensive questioning regarding prior jury service, *e.g.*, how many times the jurors had previously served, where they served, how long ago they served, whether it was a civil or criminal matter, and whether the jury had arrived at a verdict. Under these circumstances, the district court did not unreasonably restrict the voir dire examination.

Rogers also contends that the trial court abused its discretion in denying his request for continuance, which was made in order to obtain an expert to analyze the results of blood tests conducted by the prosecution. The court denied the motion on the ground that although the blood tests were unavailable to the defense until shortly before trial, there was ample time before the trial actually commenced for the defense to review the evidence and prepare accordingly. Because the record reflects that defense counsel had knowledge of the blood samples as early as several weeks before trial, and defendant had not demonstrated any prejudice that might have resulted from the lack of further analysis of the blood samples, the district court acted within its discretion in denying the continuance. McCabe v. State, 98 Nev. 604, 655 P.2d 536 (1982).

Finally, we are advised by the defendant that the criminal informations were improperly joined for trial because there was no express finding that the informations were suitable for joinder. This contention is also meritless. The evidence of grand larceny of the truck and the attempted murder of Ray Horn was admissible as evidence of flight from the scene of the homicides. Thus,

the offenses constituted a single or continuing course of conduct that validated the joinder. There was no abuse of discretion. NRS 174.155; 174.165; Lovell v. State, 92 Nev. 128, 546 P.2d 1301 (1976). Moreover, defendant did not object to the consolidation of cases below and therefore is precluded from raising the issue for the first time on appeal. McCullough v. State, 99 Nev. 72, 657 P.2d 1157 (1983).

## *The Penalty Phase*

Defendant initially contends that NRS 175.552[1] violates due process because it permits the admission of hearsay and inadmissible evidence at the penalty phase. NRS 175.552 specifically allows the admission, at the penalty hearing, of such evidence as it relates to the character and record of the individual offender. Allen v. State, 99 Nev. 485, 665 P.2d 238 (1983); Woodson v. North Carolina, 428 U.S. 280 (1976). The State presented credible evidence during the penalty hearing on the circumstances of defendant's prior felony convictions involving violence. NRS 200.033(2). The evidence of prior felony convictions admitted against Rogers fell within the hearsay exception of prior convictions. NRS 51.295. As such, it was admissible regardless of NRS 175.552.

Defendant next asserts that he was denied due process because, pursuant to NRS 175.552,[2] one week's notice of the prosecution's intent to present evidence of the aggravating circumstance of prior convictions involving violence was inadequate. From the date of the filing of the notice to seek the death penalty to the date of the penalty hearing, defendant had over three months to develop mitigating circumstances. Although he did not receive the formal notice of the aggravating circumstance of prior felony convictions involving violence until approximately one week prior to commencement of the penalty phase, defense counsel stated on the record that he had actual knowledge of the addi-

---

[1]NRS 175.552 provides that during a penalty hearing "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and *on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible*" (emphasis added).

[2]NRS 175.552 also provides:

The state may introduce evidence of additional aggravating circumstances as set forth in NRS 200.033, other than the aggravated nature of the offense itself, only if it has been disclosed to the defendant before the commencement of the penalty hearing.

tional aggravating circumstance at least approximately two and one-half weeks prior to the commencement of the penalty hearing. Thus, there was adequate time to prepare a challenge to this aggravating circumstance, and this contention is without merit.

Defendant also argues that the court denied him adequate funds to develop testimony challenging the alleged aggravating circumstances and to present evidence of mitigating circumstances. Although Rogers' request for funds to send an investigator to Ohio to check on his background was denied, the court allocated $100 for telephone calls and indicated that, if mitigating evidence was discovered, it would reconsider allocating money for travel. Prior to the hearing, the court inquired of defense counsel what phone calls had been made and defense counsel stated that he had not contacted the investigator because he did not know who to ask the investigator to call. Under these circumstances, defendant has not shown prejudice resulting from a lack of funds to prepare mitigating circumstances for the penalty hearing.

Rogers also claims that the aggravating circumstance set forth in NRS 200.033(8), *i.e.,* that the murder involved torture, depravity of mind or mutilation of the victim, is unconstitutionally vague. He is wrong. We have recently determined that NRS 200.033(8) provides adequate guidance to the jury when the district court defines for the sentencing panel the terms "torture," "depravity of mind" and "mutilate," as that definitional language is plain and intelligible. *Deutscher,* 95 Nev. at 669, 601 P.2d at 407. In the instant case, the district court defined the terms for the sentencing panel with the definitions approved in *Deutscher.*[3] The statute is constitutional.

---

[3]The court instructed the jury during the penalty hearing as follows:

The essential elements of murder by means of torture are (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, persuasion or for any other sadistic purpose.

The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased nor does it necessarily require any proof that the deceased suffered pain.

The condition of mind described as depravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman. . . .

[T]he term "mutilate" means to cut off or permanently destroy a limb or essential part of the body, or to cut off or alter radically so as to make imperfect.

In *Godfrey v. Georgia*, 446 U.S. 420 (1980), the United States Supreme Court held that the application of a statute containing language similar to that found in NRS 200.033(8) was unconstitutional where both the victims died instantaneously. *Godfrey* is distinguishable from the instant case. In that case, the Court held there was insufficient evidence to prove that the victims had been tortured or mutilated or that the murder had been committed with depravity of mind. In the instant case, however, three victims were repeatedly shot and stabbed. One of Emery's gunshot wounds revealed that it was a post-mortem wound, or had been inflicted shortly before his death. Mary was first stabbed in the back and then shot in the chest at close range when she was near death. Meriam Strode Treadwell was shot once in the back in an execution-type killing, in which she was kneeling and the gun was pressed directly against her body. Under these circumstances, the jury was justified in finding the aggravating circumstance that the victims were tortured and the murders were committed with depravity of mind.

Defendant argues that the jury instruction on the possibility of executive clemency diverted the jury's attention from the considerations required by the Eighth Amendment and instead caused the jury to speculate about the possibility of his release.[4] While viewing the court's instruction as troubling, it does not constitute reversible error since Rogers' trial antedated our holding in Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985). In *Petrocelli,* this Court made it clear that Nevada juries who are instructed on the clemency provisions peculiar to Nevada's constitutional and statutory law, are to be fairly informed. Accordingly, we provided an instruction that is to be exclusively used when counsel requests that the jury be instructed on that subject.

---

[4]The court instructed the jury during the penalty hearing as follows:

> You are instructed that the sentence of life imprisonment without the possibility of parole does not exclude executive clemency.
> If the punishment is fixed at life imprisonment with the possibility of parole, eligibility for parole begins when a minimum of ten years has been served.
> Executive clemency involves a decision by the State Board of Pardon Commissioners to commute or reduce a defendant's sentence from life without possibility of parole to life with possibility of parole.
> Executive clemency may also involve a decision by the State Board of Pardon Commissioners to shorten the time a defendant is elibible [sic] for parole.
> The State Board of Pardon Commissioners consists of the Governor, the Attorney General and the five Justices of the Supreme Court of the State of Nevada.
> The Board can change a sentence only by a majority vote and only if the Governor is in the majority voting to change the sentence.

Since the *Petrocelli* ruling operated prospectively, the instruction provided in the instant case was validated by the decision of California v. Ramos, 103 S.Ct. 3446 (1983).

Defendant next claims that the district court erred by not providing a form or method by which the jury could set forth the specific mitigating circumstances which it found. NRS 175.554(3) provides that the jury need only state that there are no mitigating circumstances which outweigh the designated aggravating circumstances. Here, the jury stated that there was no mitigating circumstance which outweighed the stated aggravating circumstances. There is no requirement in the statute mandating that the jury be provided a form to specify the mitigating circumstances which it found. The district court complied with the verdict requirements set forth in NRS 175.554.

Under the law applicable to this case, we are required to review Rogers' sentence of death to determine whether it is "disproportionate to the penalty imposed in similar cases in this state, considering both the crime and the defendant." NRS 177.055(2)(d).[5] Proportionality review dictates that we compare all capital cases, as well as appealed murder cases in which the death penalty was sought but not imposed, and set aside those death sentences which are comparatively disproportionate to the offense, background and characteristics of the offender. Harvey v. State, 100 Nev. 340, 342, 682 P.2d 1384, 1385 (1984).

The crimes for which Rogers was convicted were brutal and heinous. The three victims were extremely vulnerable; two were over seventy years of age and the third victim was almost blind and otherwise disabled. Some of the wounds were inflicted when the victims were dead or near death. The State's theory of the case was that defendant was eating in the victim's home and killed Mary, Emery and Meriam as they arrived, without any motive of self-defense; the State also offered evidence to demonstrate Emery and defendant struggled before Emery was killed.

Although defendant was twenty-three years of age at the time of the commission of the offense, defendant had two prior convictions for aggravated assault. While some experts concluded that defendant suffered from psychotic paranoid schizophrenia at the time of the offense, another psychologist believed that defendant was faking his symptoms of mental disorder.

---

[5]NRS 177.055(2)(d) was amended on June 6, 1985, to eliminate the proportionality review requirement. II Advance Sheets of Nevada, 1597. We express no opinion as to whether the retained language of the statute continues to require such a review.

The jury found as aggravating circumstances that the murders were committed by a person who was previously convicted of a felony involving the use or threat of violence to the person of another, NRS 200.033(2), and that the murders involved torture, depravity of mind or the mutilation of the victims, NRS 200.033(8). The jury found no mitigating circumstances sufficient to outweigh the aggravating circumstances. The prior aggravated assault convictions were felonies involving violence which would support the finding of that aggravating circumstance. Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1982). The evidence of physical abuse in the stabbing of Emery and Mary, the execution of Meriam, and the struggle with Emery before he and the other victims were shot supports the finding that the murders involved torture, depravity of mind or the mutilation of the victims. *Cf.* Godfrey v. Georgia, 446 U.S. at 420 (1980).

Considering both the crimes and the defendant, we conclude that Roger's death sentence is not excessive or disproportionate to the penalty imposed in similar cases in this State. *See, e.g.,* Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985); Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985); Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984); Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979); Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979). *Cf.* Koza v. State, 100 Nev. 245, 681 P.2d 44 (1984) (life imprisonment); Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978).

Our review of the record also reveals the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor. NRS 177.055(2)(c).

The distillate of our review of all of the issues raised by defendant is that no prejudicial error occurred in defendant's trial. Accordingly, we affirm the convictions of first degree murder, attempted murder and grand larceny and the sentences imposed, including the sentence of death.[6]

SPRINGER, C. J., and MOWBRAY, GUNDERSON, and STEFFEN, JJ., and McGEE, D. J.,[7] concur.

---

[6]We have likewise reviewed defendant's supplemental brief filed after oral argument and have concluded that the issues raised therein were either raised for the first time through the supplemental brief or were otherwise covered adequately prior to the supplemental briefing. In either case, defendant's contentions are without merit.

[7]The Governor designated The Honorable Charles McGee of the Second Judicial District Court to sit in the place of THE HONORABLE CLIFF YOUNG, who voluntarily disqualified himself. Nev. Const., art. 6, § 4.