SIAOSI VANISI, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 35249

May 17, 2001

22 P.3d 1164

*Michael R. Specchio,* Public Defender, and *John Reese Petty,* Chief Deputy Public Defender, Washoe County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, and *Terrence P. McCarthy,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, SHEARING, J.:

The State charged appellant Siaosi Vanisi with the first-degree murder of George Sullivan, a police sergeant at the University of Nevada, Reno (UNR), and four other felonies. Vanisi's first trial ended in a mistrial. At the second trial, the jury found Vanisi guilty of all five offenses and imposed a death sentence for the murder.

The primary issue on appeal is Vanisi's claim that the district court erred in denying his motion for self-representation. We reject this claim as well as Vanisi's other contentions and affirm the judgment of conviction and the sentence of death.

### FACTS

The evidence of Vanisi's guilt in this case is overwhelming. During a visit to Reno in January 1998, Vanisi told several friends and relatives that he wanted to murder and rob a police officer. Makeleta Kavapalu testified that Vanisi indicated that "he was going to kill a police officer with his ax." Sateki Taukiuvea testified that Vanisi said that he wanted to kill a police officer and take his badge, radio, gun, and belt. Maria Louis testified that Vanisi said he wanted to kill a police officer and take his radio and gun. Priscilla Endemann testified that Vanisi repeatedly told her he wanted to "kill a cop."

Mele Maveni testified that on January 9, 1998, she accompanied her cousin and Vanisi to a local Wal-Mart where Vanisi purchased a hatchet and a pair of gloves. He told Maveni and her cousin that he wanted to kill police officers.

In the early morning of January 13, 1998, UNR Police Sergeant George Sullivan was murdered and robbed on the UNR campus. At least two witnesses, including UNR Police Officer Carl Smith, observed Vanisi near the murder site shortly before the time of the killing. Officer Smith testified that sometime after 12:17 a.m. he observed Vanisi in the same area as Sullivan, who had made a traffic stop. Vanisi had dreadlocks and was wearing a dark jacket. Subsequently, Smith observed Sullivan head towards the area of a kiosk, a fairly well lit area where officers wrote reports.

A short time later, a student discovered Sullivan's body lying under his police car near the kiosk. Smith received a dispatch just before 1:00 a.m. and was the first officer at the scene. Several items that Sullivan had been carrying were missing, including his gun and gun belt.

Dr. Ellen Clark performed the autopsy on Sullivan's body. The cause of death was multiple injuries to the skull and brain due to blunt impact trauma.

Shortly after the killing, Vanisi proceeded to an apartment occupied by some of his relatives. His niece, Maria Louis, testified that Vanisi entered the apartment between 1:00 and 1:15 a.m. wearing a jacket and gloves and carrying a plastic grocery bag. Many of the injuries to Sullivan's body were consistent with a hatchet that was discovered at the apartment, apparently the hatchet purchased by Vanisi a few days before. Police also recovered other evidence at the apartment, including a pair of gloves, a jacket, and plastic bags containing items belonging to Sullivan. Vanisi's fingerprints were found on one of the bags. Stains on the hatchet and jacket contained Sullivan's DNA. The gloves contained DNA from both Sullivan and Vanisi.

After the killing, Vanisi told others that he had killed Sullivan. Vainga Kinikini testified that Vanisi provided him with the following details of the crime. Vanisi had bought a hatchet and had been looking for a white police officer to kill. He observed a police officer in the middle of a traffic stop. He waited for the officer to complete the stop and then crept up on the officer. He knocked on the window of the officer's patrol car, and the officer asked if he could help Vanisi. Vanisi attacked the officer and knocked him out. Vanisi then kicked the officer over and over, "stomping" on his head. Vanisi stated that it was "fun" or "great." He had worn a disguise at the time of the killing, a beanie with fake dreadlocks to make him look Jamaican. He threw the wig and beanie into a canal nearby. (A wig and baseball cap were later discovered in a ditch near the UNR campus.) Vanisi also showed Kinikini a gun that he claimed was a police officer's.

The State presented evidence that Vanisi committed three other crimes on the evening after the killing: the theft of a car in Reno,

which was later recovered in Salt Lake City outside a residence where Vanisi was apprehended; and two store robberies. Witnesses to both robberies identified Vanisi as the perpetrator, and a surveillance videotape and a surveillance photograph supported their testimony.

On January 14, 1998, police apprehended Vanisi at a residence in Salt Lake City. Vanisi did not comply with police orders to exit the residence, and a SWAT team entered after Vanisi set a fire in the garage. Vanisi confronted one officer with a handgun, and the officer fired several shots, hitting Vanisi in the arm. Police partially withdrew and attempted to persuade Vanisi to surrender. Vanisi eventually emerged but refused to obey officers' commands, so he was subdued with a "bean-bag" round. Police discovered Sergeant Sullivan's gun in the residence. Boots and pants that Vanisi had worn tested positive for Sullivan's DNA.

The jury found Vanisi guilty of first-degree murder and three counts of robbery, all with the use of a deadly weapon, and one count of grand larceny.

At the penalty phase, the State presented testimony about Vanisi's disciplinary problems during his pretrial incarceration. Vainga Kinikini again testified about Vanisi's statements concerning the killing. Vanisi said that once he had killed, he had to kill some more to keep his "high" or "rush." Kinikini indicated that Vanisi was "smart" but "insane, crazy" and that Vanisi himself said he was insane and did not care anymore. The State presented victim impact testimony from several individuals, including Sullivan's sister, wife, and daughter.

The defense called a number of witnesses, including Vanisi's relatives. Some of the witnesses indicated that Vanisi had changed in the last few years. For example, Vanisi's wife testified that Vanisi had been friendly, outgoing, and kind but began to change in late 1995 and 1996. At times Vanisi became violent and abusive, he exhibited poor hygiene and bizarre behavior, he would ramble, and he lacked a sense of reality. Vanisi would sometimes pose in front of a mirror pretending to be different people and would dress as a superhero. Eventually, Vanisi's wife left him. Testimony at the penalty phase indicated that drug use by Vanisi might have been a factor in his changed behavior.

The defense also called a psychiatrist, Dr. Ole Thienhaus, who treated patients at the county jail, including Vanisi. Thienhaus testified that his initial diagnosis of Vanisi indicated possible bipolar disorder, also known as manic depression, or cyclothymia, a similar condition. Thienhaus stated that a colleague who had seen Vanisi independently had the same impressions of his condition. During his pretrial incarceration, Vanisi had been prescribed various medications, including Depakote (a mood stabilizer, discontinued after Vanisi complained of side effects), lithium (for

bipolar disorder), and Risperdal (an antipsychotic medication). Thienhaus indicated, however, that Vanisi's bipolar disorder did not appear to be an extreme case. Thienhaus explained that bipolar disorder could be characterized by psychotic episodes, *i.e.,* a loss of touch with reality, and that violent behavior might occur in the manic phase. However, Thienhaus testified that this kind of "out-of-control" behavior was impulsive and inconsistent with planning for a crime. He acknowledged that it was possible that Vanisi was "malingering," *i.e.,* fabricating symptoms, but he thought it was more likely that Vanisi did in fact suffer from bipolar disorder.

On cross-examination, the State referenced reports from other professionals who had evaluated Vanisi. Although there was some additional support for a diagnosis of bipolar disorder, some professionals indicated that Vanisi exhibited signs of malingering.

Vanisi did not testify at the penalty phase but made a statement in allocution. He apologized to Sullivan's family and his own. He said that if he had known he was ill he would have gone to a doctor. He referred to his use of speed and marijuana and lack of sleep before the crime. "This is not an excuse, but a reason. I fell away from my church and my values." If given the opportunity, he hoped "to try to help others avoid the nightmare of drugs and despair."

The jury imposed a death sentence for the murder, finding three aggravating circumstances: the murder occurred in the commission of or an attempt to commit robbery; the victim was a peace officer engaged in the performance of his official duties, and the defendant knew or reasonably should have known the victim was a peace officer; and the murder involved mutilation. The jury did not find a fourth alleged aggravating circumstance: the murder was committed because of the victim's actual or perceived race, color, religion, or national origin. The district court sentenced Vanisi to consecutive prison terms for the other offenses.

## DISCUSSION

### I. *Appellant's motion for self-representation*

Vanisi asserts that the district court improperly denied a motion for self-representation that he made before the second trial.

A criminal defendant has the right to self-representation under the Sixth Amendment of the United States Constitution and the Nevada Constitution.[1] However, an accused who chooses self-representation must satisfy the court that his waiver of the right

---

[1]U.S. Const. amend. VI; *Faretta v. California,* 422 U.S. 806, 818-19 (1975); Nev. Const. art. 1, § 8, cl. 1.

to counsel is knowing and voluntary.[2] Such a choice can be competent and intelligent even though the accused lacks the skill and experience of a lawyer, but the record should establish that the accused was "made aware of the dangers and disadvantages of self-representation."[3] A court may also deny a request for self-representation if the request is untimely, equivocal, or made solely for purposes of delay or if the defendant is disruptive.[4] Deprivation of the right to self-representation is reversible, never harmless, error.[5]

Vanisi filed a motion for self-representation in early August 1999, after orally requesting to be allowed to represent himself. At that time, the trial was scheduled to commence on September 7. On August 10, the district court held a hearing on the motion: it canvassed Vanisi pursuant to SCR 253 and heard testimony from a psychiatrist who had treated Vanisi. The next day the court entered an order denying Vanisi's motion and detailing extensive findings of fact and conclusions of law.

The district court did not question that Vanisi was prepared to enter a knowing, intelligent, and voluntary waiver of his right to counsel. Instead, the court gave three basic reasons for denying Vanisi's motion: the motion was made for purpose of delay; Vanisi was abusing the judicial process and presented a danger of disrupting subsequent court proceedings; and the case was a complex, death penalty case, and the court had concerns about Vanisi's ability to represent himself and receive a fair trial. We consider each reason in turn.

### Purpose of delay

First, the district court found that Vanisi's motion for self-representation was made for purpose of delay. The court referred to prior actions by Vanisi that had resulted in delay, including a personal request by Vanisi for a continuance, Vanisi's motion to appoint new counsel, his subsequent refusal to cooperate with counsel, and the consequent need for a competency evaluation. The court also believed that Vanisi had decided to represent himself long before he actually made his request to do so. The court concluded, "Although the defendant states he is not making this motion for the purpose of delay, the court finds otherwise in light

---

[2]*Faretta,* 422 U.S. at 835; *Godinez v. Moran,* 509 U.S. 389, 400-01 (1993).

[3]*Faretta,* 422 U.S. at 835.

[4]*Tanksley v. State,* 113 Nev. 997, 1001, 946 P.2d 148, 150 (1997).

[5]*McKaskle v. Wiggins,* 465 U.S. 168, 177 n.8 (1984).

of his previous actions and requests in this case." Indeed, at an earlier hearing on a motion by Vanisi to dismiss his counsel, the court had stated that it appeared "that Mr. Vanisi has an agenda to delay the trial."

As the district court acknowledged, Vanisi's motion was technically timely. Vanisi made his motion approximately one month before the scheduled start date for the trial and did not request a continuance. "If it is clear that the request comes early enough to allow the defendant to prepare for trial without need for a continuance, the request should be deemed timely."[6] Nevertheless, "a specific finding of dilatory intent" provides "a separate and distinct basis for denial of the request."[7]

The Ninth Circuit has explained that the district court may deny a request for self-representation in circumstances where the defendant's prior conduct indicates that he or she is making the request as a delaying tactic:

> Of course, a request for self-representation need not be granted if it is intended merely as a tactic for delay. Moreover, a court may consider events [preceding] a motion for self-representation to determine whether the request is made in good faith or merely for delay. Thus, if the district judge determines that the . . . request is part of a pattern of dilatory activity, the court has the discretion to deny the continuance and require the defendant to proceed to trial on the scheduled date either with the counsel designated or pro se.[8]

The district court determined that Vanisi's request was part of a pattern of dilatory activity based on his prior behavior. Although Vanisi said during the *Faretta* canvass that he would be prepared to go to trial on schedule and that his motion was not for purpose of delay, we decline to substitute our judgment for the district court's direct observations and findings on this matter.[9] We conclude that the district court acted within its discretion in finding that Vanisi harbored an intent to delay the proceedings.

*Abuse of process and risk of disruption*

The district court also concluded that Vanisi was "abusing the

---

[6]*Lyons v. State,* 106 Nev. 438, 446, 796 P.2d 210, 214 (1990).

[7]*Id.* at 446, 796 P.2d at 214-15.

[8]*U.S. v. Flewitt,* 874 F.2d 669, 674-75 (9th Cir. 1989) (citations omitted).

[9]*See Tanksley,* 113 Nev. at 1001-02, 946 P.2d at 150-51.

right of self-representation by disrupting the judicial process'' and inferred from Vanisi's past conduct that he presented a danger of disrupting the trial.

The United States Supreme Court has stated that an accused has the right to conduct his own defense provided that he is ''able and willing to abide by rules of procedure and courtroom protocol.''[10] ''The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law.''[11] This court has stated that in considering a request for self-representation, a defendant's pretrial activity is relevant if it indicates that he or she will be disruptive in the courtroom.[12] Since the district court is in a better position to observe a defendant's demeanor and conduct, this court will not substitute its own evaluation for the district court's personal observations and impressions.[13]

We conclude that the district court made appropriate and sufficient findings to support a conclusion that Vanisi was unable or unwilling to abide by rules of procedure and courtroom protocol. The court noted that Vanisi had interrupted prior hearings by ''blurt[ing] out statements in a loud voice.'' Vanisi also talked while others were speaking in court, stood up and engaged in unsettling rocking motions, and repeated himself over and over. Vanisi ''spoke out loud to himself in such a manner that it was at times difficult to determine if he was speaking for his own benefit or to the courtroom audience or the court.'' At the self-representation canvass, Vanisi ''exhibited difficulty in processing information'' and ''took an extremely lengthy period of time to respond to many of the court's questions, the courtroom proceedings stopping for two to three minutes at times while he pondered his answer.'' At times, Vanisi asked the court ''to repeat the same question many times before answering'' and even refused to answer a question that he believed to be an incomplete sentence. Vanisi frequently asked the district court questions instead of answering the court's questions. At one hearing, Vanisi continued to question the district court after the court indicated that Vanisi should address his counsel. The district court also noted its concern with Vanisi's ''history of aggressive and disruptive behavior while at the Nevada State Prison.''

[10]*McKaskle,* 465 U.S. at 173.

[11]*Faretta,* 422 U.S. at 835 n.46.

[12]*See Tanksley,* 113 Nev. at 1001, 946 P.2d at 150.

[13]*Id.* at 1001-02, 946 P.2d at 150-51; *cf. Stewart v. Corbin,* 850 F.2d 492, 497-98 (9th Cir. 1988).

We conclude that the district court acted within its discretion in finding that Vanisi had shown himself unable or unwilling to abide by rules of procedure and courtroom protocol.

> *Case complexity, the ability to represent oneself, and trial fairness*

The district court further concluded that the instant case was so complex that permitting Vanisi to represent himself would deny him a fair trial. In two of our own cases, this court has cited the complexity of the case and fair-trial concerns as a basis for denying a defendant's request for self-representation.[14] We now clarify that though this factor is relevant on the issue of whether a defendant's decision to waive counsel was made understanding the potential consequences of the decision, it is not an independent basis for denial of a motion for self-representation.

The Ninth Circuit has pointed out: "In deciding whether a defendant has knowingly and intelligently decided to represent himself, the trial court is to look not to the quality of his representation, but rather to the quality of his decision."[15] The district court should inquire of a defendant about the complexity of the case to ensure that the defendant understands his or her decision and, in particular, the difficulties he or she will face proceeding in proper person. But to regard the complexity of the case and related fair-trial concerns as considerations independent of this inquiry, we conclude, does not comport with the law on self-representation.

The United States Supreme Court has recognized that "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation."[16] This court has similarly stated that "[t]he relevant assessment examines the accused's competence to choose self-representation, not his ability to adequately defend himself."[17] Accordingly, if a defendant willingly waives counsel and chooses self-representation with an understanding of its dangers, including the difficulties presented

---

[14]*See Meegan v. State,* 114 Nev. 1150, 1154, 968 P.2d 292, 294 (1998) ("[B]ased on the complexity of the case, the district court properly denied Meegan's request to represent himself."); *Lyons,* 106 Nev. at 444, 796 P.2d at 214 ("A court may deny a defendant's request to represent himself when a case is so complex that the defendant would virtually be denied a fair trial if allowed to proceed *pro se.*").

[15]*Bribiesca v. Galaza,* 215 F.3d 1015, 1020 (9th Cir. 2000).

[16]*Godinez,* 509 U.S. at 400.

[17]*Harris v. State,* 113 Nev. 799, 802, 942 P.2d 151, 153 (1997).

by a complex case, he or she has the right to do so. We discern no *Faretta* exception where a defendant's assertion of the right to self-representation would be especially unwise.[18] The United States Supreme Court has "emphasized that although the defendant 'may conduct his own defense ultimately to his own detriment, his choice must be honored,'" even though it is undeniable that in most cases a defendant is better represented by counsel.[19]

## II. *The aggravating circumstance of mutilation*

Vanisi claims that the aggravating circumstance of mutilation does not apply in this case. We reject this claim.

NRS 200.033(8) provides for an aggravating circumstance where "[t]he murder involved torture or the mutilation of the victim." Here, the State proceeded on a theory of mutilation. This court has approved a jury instruction that defines "mutilate" as "to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect."[20] "Mutilation requires an act beyond the act of killing itself."[21]

There is compelling evidence establishing mutilation here. Dr. Clark, who performed the autopsy, testified to the extensive and severe injury inflicted on Sullivan's body. Clark identified at least twenty separate and distinct impacts to Sullivan's face and head. Sullivan had "many, many lacerations" and some of Sullivan's teeth were actually found outside of the body. Clark testified that the weapon used in the offense was "wielded in different fashions, that some of the injuries are coming this direction, some are coming this direction, some are coming towards the back, and other injuries are made with a sharp portion of the blade." Clark also found that some injuries to Sullivan's chin and jaw and to the back of his head were more consistent with "broad flat impact," possibly "stomping." Sullivan sustained skull fractures, fractures to virtually all of the facial bones, and damage to the brain. This physical evidence is consistent with the testimony of one of Vanisi's relatives concerning Vanisi's description of the murder. According to this account, even after Sullivan was knocked out by Vanisi's initial assault, Vanisi proceeded to kick Sullivan over and over, "stomping" on Sullivan's head.

---

[18]*See* 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.5(d), at 584-85 (2d ed. 1999).

[19]*Godinez,* 509 U.S. at 400 (quoting *Faretta,* 422 U.S. at 834).

[20]*Smith v. State,* 114 Nev. 33, 39, 953 P.2d 264, 267 (1998).

[21]*Browne v. State,* 113 Nev. 305, 316, 933 P.2d 187, 193 (1997).

Given the weight of this evidence, we conclude that Vanisi's assault went well beyond the act of killing itself and resulted in mutilation of the victim's body.[22]

Although Vanisi does not specifically challenge the jury instruction on appeal, we note that it included some language no longer mandated by the statutory aggravating circumstance. The jury was instructed: "The term 'mutilate' means to cut off or permanently destroy a limb or essential part of the body, or to cut off or alter radically so as to make imperfect, *or other serious and depraved physical abuse* beyond the act of killing itself."[23] This instruction is largely the same as the one we have approved. However, the emphasized language appears to come from an instruction based on a former version of NRS 200.033(8), which referred to "depravity of mind" as well as torture and mutilation.[24] In 1995, the Legislature amended the statute to delete "depravity of mind."[25]

Use of the instruction here was not prejudicial since the State did not argue depravity of mind and there was compelling evidence of mutilation, as discussed above. We take this opportunity, however, to clarify that language referring to "other serious and depraved physical abuse" should no longer be included in a definition of mutilation.

## III. *Mandatory review of the death sentence*

NRS 177.055(2) requires this court to review every death sentence and consider in addition to any issues raised on appeal:

> (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
> (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
> (d) Whether the sentence of death is excessive, considering both the crime and the defendant.

---

[22]*Cf. Browne,* 113 Nev. at 316-17, 933 P.2d at 194 (upholding a finding of mutilation where the victim received repeated blows to the head which destroyed her brain, some blows were inflicted after she became unconscious, and any one of the blows could have killed her).

[23]Emphasis added.

[24]*See Smith,* 114 Nev. at 35-37, 953 P.2d at 265-66.

[25]The amendment applies to offenses committed on or after October 1, 1995. 1995 Nev. Stat., ch. 467, §§ 1-3, at 1490-91.

First, there is evidence to support each of the aggravating circumstances. We have already discussed mutilation. The remaining aggravating circumstances are also supported by the evidence. With regard to the aggravating circumstance of robbery or attempted robbery, the evidence shows that Vanisi took Officer Sullivan's gun belt and gun. With regard to the aggravating circumstance of killing a peace officer, there is evidence that Sullivan was on duty, in uniform, and in his police car when he was attacked. Further, Vanisi's statements to various individuals about his intent to kill and rob a police officer support the jury's finding of both aggravating circumstances.

Second, we have reviewed the record and conclude that Vanisi's death sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor.

Vanisi makes one contention in this regard. Because the jury made no findings with respect to mitigating circumstances, he argues that the jury improperly rejected persuasive mitigating evidence. This contention lacks merit. Here, the jury was not asked to detail its findings concerning mitigating circumstances, and there is no requirement that a jury receive a form to specify the mitigating circumstances it has found.[26] NRS 175.554(3) provides that the jury need only state that there are no mitigating circumstances which outweigh the aggravating.[27] We perceive no basis to conclude that the jurors did not duly consider the mitigating evidence before them.

Third, we conclude that the death penalty is not excessive. The instant crime was a cold, calculated, and brutal killing. Vanisi had planned to kill a police officer well in advance of the murder, and he carried that plan into action, going so far as to disguise himself before the killing. The actual act of killing was completely unprovoked and particularly violent. Vanisi indicated afterwards that he enjoyed it and would like to kill again. It is true that this case is not without mitigating evidence, including testimony by Vanisi's family and other evidence indicating that he has mental health problems. Nevertheless, despite these problems, the level of planning behind this killing shows that it was more than a rash impulse acted on during a psychotic episode arising from bipolar disorder.

[26]*Rogers v. State,* 101 Nev. 457, 469, 705 P.2d 664, 672 (1985).
[27]*Id.*

## IV. *The statutory instruction on reasonable doubt*

Finally, Vanisi claims that the district court erred in rejecting his proffered instruction on reasonable doubt and instructing the jury pursuant to NRS 175.211. The court did not err in using the mandatory statutory instruction.[28]

## CONCLUSION

We conclude that the district court did not err in denying Vanisi's motion to represent himself. Vanisi's other claims also lack merit. We therefore affirm his judgment of conviction and sentence.

MAUPIN, C. J., YOUNG and LEAVITT, JJ., concur.

ROSE, J., with whom AGOSTI and BECKER, JJ., agree, concurring:

I concur in the majority's conclusion that Vanisi's request to represent himself was improperly denied on the bases of the delay in asserting his request and the complexity of the case. I also agree that the district court's denial of Vanisi's motion for self-representation was proper because Vanisi exhibited a risk of disruption, but only because of this court's deferential policy toward the findings of fact of the district court on this issue. The facts of this case should set the high-water mark for the denial of a defendant's constitutional right of self-representation.

We have held that a defendant's pretrial conduct is relevant " 'if it affords a strong indication that [he or she] will disrupt the proceedings in the courtroom.' "[1] I question whether the district court's findings provide a "strong indication" that Vanisi would be disruptive at trial. Many of the court's findings are more indicative of inconvenience than disruption. A request for self-representation should not be denied solely " 'because of the inherent inconvenience often caused by *pro se* litigants.' "[2]

My review of the record reveals that, at least at the hearing on the motion for self-representation, Vanisi was generally articulate, respectful, and responsive during rigorous examination by the dis-

---

[28]*See, e.g., Bollinger v. State,* 111 Nev. 1110, 1115 & n.2, 901 P.2d 671, 674 & n.2 (1995) (upholding the constitutionality of the instruction particularly where [as here] the jury received additional instruction on the State's burden of proof and the presumption of innocence).

[1]*Tanksley v. State,* 113 Nev. 997, 1001, 946 P.2d 148, 150 (1997) (quoting *United States v. Flewitt,* 874 F.2d 669, 674 (9th Cir. 1989)).

[2]*Tanksley,* 113 Nev. at 1001, 946 P.2d at 150 (quoting *Lyons v. State,* 106 Nev. 438, 444 n.1, 796 P.2d 210, 217 n.1 (1990)).

trict court. It does not appear that Vanisi actually disrupted earlier proceedings, although the court's frustration with Vanisi has some factual basis. At one hearing, for instance, Vanisi continued to question the court after the court had indicated that Vanisi should address his counsel. At that time Vanisi's own counsel complained, and the court responded: "Actually, I didn't think he is any worse than you. But you can go on. I mean, you have interrupted me on many occasions. I mean, he is excitable but I would not call him manic." The transcript of this hearing as a whole reveals that Vanisi was generally respectful to the court, rarely interrupted or continued speaking inappropriately, and complied when the court told him to refrain from such conduct. I note, however, that toward the end of the hearing the court had to instruct Vanisi to keep his voice down while others were speaking; the court stated: "You have to whisper. You are interfering."

Assessments of Vanisi's behavior by defense counsel and by the State also contradict the district court's ultimate evaluation. At the canvass, defense counsel commented that Vanisi's behavior had "been impeccable since this case first came into this courtroom" and that there was "absolutely nothing he has done in this courtroom over the past year-and-a-half which reflects that he's going to delay or obstruct or in any way make himself a nuisance." Counsel explained, "[h]e had five days when he was in trial. He minded his manners. He's observed decorum. He's paid respect and courtesy to this Court." The State agreed that Vanisi had not been disruptive whenever the State was present. The prosecutor explained,

> I would indicate to the Court that at least the times in court that the State has been present . . . Mr. Vanisi has been anything but disruptive. I think he responded very literally to the Court's inquiry, was cognizant of the questions and the proceedings surrounding them, oriented to time and place, and satisfies that criteria across the board.

The prosecutor commented further that Vanisi had "significant" ability to read and process information and that he was "distinctly and cognitively more adept at defending himself than any defendant I have ever been involved with." Finally, Vanisi himself represented to the court that he would behave properly within the court's guidelines and that he did not intend to disrupt the proceedings.

The court also commented on two other factors relating to the potential for disruption that were independent of Vanisi's courtroom conduct. First, the court cited Vanisi's "history of aggressive and disruptive behavior while at the Nevada State Prison." The relevance of Vanisi's out-of-court behavior in this case is

questionable to me, given his apparently non-violent and generally appropriate in-court behavior and the fact that some of his out-of-court behavior and prior conduct might have been due to an untreated bipolar disorder.[3]

Second, the court noted that Vanisi had indicated that he wanted less confinement in the courtroom and that it appeared that Vanisi expected that he would be permitted unrestricted movement if allowed to represent himself. The court commented that, if denied full movement, it appeared that Vanisi would complain on appeal that he did not have an equal opportunity to present his case and that this revealed ''a 'tactic' intended to disrupt the judicial process.'' I believe that there is little basis for the district court to rely on Vanisi's apparent desire to have full movement in the courtroom as a reason to deny his constitutional right of self-representation. Vanisi did not condition his request for self-representation on full movement or indicate that he would not abide by the court's rules. When the court asked if Vanisi understood that the court would not allow him more movement in the courtroom than had been allowed thus far, Vanisi indicated that he understood. He further stated, however, that the court should ''put it on the record'' that it wanted him ''to conduct a fair trial standing [like] a statu[e],'' but that it was ''fine'' so long as the court ''put it on the record.''

From the record before this court, it is difficult to find ''strong indications'' that Vanisi would have been disruptive in future proceedings. A defendant's constitutional right to self-representation should not be denied merely because of indications of future inconveniences or moderate disruptions. However, this court has stated that on this issue it ''will not substitute its evaluation for that of the district court judge's own personal observations and impressions.''[4] On this basis alone, I concur in the affirmance of the district court's denial of Vanisi's request for self-representation.

---

[3]*Compare Stewart v. Corbin,* 850 F.2d 492 (9th Cir. 1988) (concluding that shackling and gagging of defendant and consequent termination of right to self-representation (due to gagging) were constitutional, given defendant's egregious in-court behavior as well as some prior out-of-court behavior).

[4]*Tanksley,* 113 Nev. at 1002, 946 P.2d at 151.